RECEIVED
AUG 2 1 2026
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BRITTANI LARSON,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON COUNTY; CITY OF OAKDALE; INDEPENDENT SCHOOL DISTRICT 622; SOCIAL WORKER TITI RUSSELL, in her individual capacity; SOCIAL WORKER QUEETA KEKULAH, in her individual capacity; OAKDALE POLICE DETECTIVE KIMBERLY COFFEY, in her individual capacity; OAKDALE POLICE OFFICER NICHOLAS KOETHE, in his individual capacity; JOHN GLENN MIDDLE SCHOOL ASSISTANT PRINCIPAL MARNIE GALVIN, in her individual capacity,<br><br>Defendants. | Case No.: 26-cv-3736 KMM/JFD<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

1. This action arises from the September 8, 2022 removal of Plaintiff's minor children following Plaintiff's emergency hospitalization for severe preeclampsia, a natural birth delivery, postoperative complications, and continued inpatient medical treatment. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress violations of rights secured by the United States Constitution.

2. Plaintiff Brittani Larson is appearing pro se. Plaintiff asserts only her own personal constitutional claims. She does not appear on behalf of her minor children or assert any claims belonging to them.

SCANNED
AUG 2 1 2026
U.S. DISTRICT COURT ST. PAUL

3. Plaintiff brings this action solely for monetary damages and related relief for independent constitutional torts that occurred prior to and separate from any state-court adjudication. Plaintiff does not seek to overturn, modify, set aside, or in any way disturb the judgments, orders, or outcomes of any state court child-protection proceedings, all of which have concluded. This Court's jurisdiction is invoked solely to redress injuries caused by the individual defendants' extrajudicial conduct, not to review or reject any state court determination.

4. Plaintiff does not challenge the authority of child-protection agencies or law enforcement to intervene when children face an immediate threat to their safety. Nor does Plaintiff contend that government officials violate the Constitution merely by initiating a child-protection investigation or seeking judicial review when supported by law and fact.

5. Rather, Plaintiff alleges that Defendants Russell, Kekulah, and Koethe exercised extrajudicial governmental custody over her children in the field before documented legal authority existed to do so and failed to include in subsequent court filings information documented in contemporaneous records.

6. Plaintiff further alleges that Defendants Russell and Washington County possessed contemporaneous medical information concerning Plaintiff's hospitalization, recovery, and interactions with her newborn daughter that was relevant to decisions affecting Plaintiff's parental rights. Plaintiff alleges that this information—including observations documented by Plaintiff's treating neonatologist—was not reflected in the information presented during the initial stages of the child-protection proceedings.

7. Plaintiff also alleges that her oldest child was removed from school grounds by Defendant Galvin, in coordination with Washington County Community Services personnel, under circumstances that raise independent constitutional questions separate from the events occurring at Plaintiff's residence earlier that day.

8. This case therefore presents discrete constitutional questions concerning the exercise of field-based governmental authority by the Individual Defendants, including the timing and legal basis for the physical seizure of Plaintiff's children, the adequacy of procedural protections afforded to Plaintiff, the accuracy and completeness of information utilized during administrative proceedings, and the conduct of individual governmental actors participating in those events.

9. Plaintiff seeks compensatory damages and such additional relief as this Court deems just and proper.

## II. JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

11. Venue is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred within this judicial district, specifically within Washington County and Ramsey County, Minnesota.

## III. THE PARTIES

12. Plaintiff Brittani Larson is an adult individual residing in Oakdale, Minnesota, and is the natural mother of the minor children subject to the removals described herein: R.T. (age 18 months at the time of the incident), J.L. (age 11 at the time of the incident), and A.T. (a newborn infant at the time of the incident).

13. Defendant Washington County is a political subdivision and municipal corporation organized under the laws of the State of Minnesota, responsible for the administration, policies, customs, training, and oversight of the Washington County Community Services Department and its child protection personnel.

14. Defendant City of Oakdale is a municipal corporation organized under the laws of the State of Minnesota, responsible for the operation, training, policies, and customary practices of the Oakdale Police Department.

15. Defendant Social Worker Titi Russell was at all times relevant employed by Washington County as a primary child protection worker. She is sued in her individual capacity.

16. Defendant Social Worker Queeta Kekulah was at all times relevant employed by Washington County as a child protection worker. She is sued in her individual capacity.

17. Defendant Oakdale Police Detective Kimberly Coffey was at all times relevant a licensed law enforcement officer employed by the Oakdale Police Department. She is sued in her individual capacity.

18. Defendant Oakdale Police Officer Nicholas Koethe was at all times relevant a licensed law enforcement officer employed by the Oakdale Police Department. He is sued in his individual capacity.

19. Defendant Independent School District 622 (ISD 622) is a public school district organized under the laws of the State of Minnesota, operating John Glenn Middle School, and responsible for the administrative policies, training, customs, and security protocols governing the custody, care, and release of student minors to third parties.

20. Defendant Marnie Galvin was at all times relevant employed by ISD 622 as the Assistant Principal of John Glenn Middle School. She is sued in her individual capacity.

## IV. FACTUAL ALLEGATIONS

### The Removal and Timeline Sequence (September 8, 2022)

21. On September 8, 2022, Plaintiff Brittani Larson was at her residence in Oakdale, Minnesota, recovering from multiple recent emergency surgical procedures, including a diagnostic laparoscopy, drainage of an intra-abdominal abscess, a laparoscopic appendectomy, and lysis of adhesions.

22. Defendant Washington County Social Worker Queeta Kekulah arrived at Plaintiff's residence to conduct an intake home visit in place of the primary assigned worker, Defendant Titi Russell.

23. Defendant Kekulah did not present physical identification or credentials upon request, stating she lacked business cards, and communicated that she held a supervisory role within the department.

24. Defendant Kekulah asked Plaintiff and an adult associate to provide drug screens.

25. Plaintiff requested an opportunity to consult with legal counsel prior to complying, which Defendant Kekulah denied, stating that the removal of the children would proceed.

26. On three separate occasions during the visit, Plaintiff, the adult associate, and Plaintiff's mother requested that Defendant Kekulah depart the residence. Defendant Kekulah remained on the premises.

27. Defendant Kekulah subsequently contacted the Oakdale Police Department at 11:25am to request that law enforcement place Plaintiff's minor children on an emergency 72-hour health and welfare hold.

28. Defendant Oakdale Police Officer Nicholas Koethe responded to the scene at 11:43am.

29. Upon assessing the situation, Officer Koethe declined Defendant Kekulah's request to place the children on an emergency hold. According to Defendant Kekulah's official records, law enforcement advised that they did not observe an immediate threat inside the home.

30. According to Defendant Kekulah's official Investigation/Family Assessment Summary notes, law enforcement instructed Defendant Kekulah and Plaintiff's mother to clear the immediate area due to "safety concerns" regarding an associate who had already departed, while law enforcement left Plaintiff inside the residence.

31. Following the alleged directives recorded in the county notes, Defendant Kekulah departed the scene with Plaintiff's mother and took physical custody of Plaintiff's 18-month-old daughter, R.T.

32. Plaintiff objected to the removal of her daughter from the residence, but due to recent emergency surgeries, Plaintiff was unable to physically prevent the departure. Law enforcement personnel "stood by" while Defendant Kekulah took physical custody of the minor child without a warrant, court order, or signed peace officer hold form, allowing Plaintiff five minutes to pack a bag for the minor. Minor child A.T. remained inpatient at the hospital facility.

33. Defendant Kekulah and Plaintiff's mother drove to a nearby Kwik Trip convenience store.

34. At the Kwik Trip location, Defendant Kekulah renewed her request that an Officer authorize an emergency hold on the minor children. The officer declined the request a second time.

35. Following this second refusal at the Kwik Trip location, Defendant Kekulah recorded the following entry in the official county Investigation/Family Assessment Summary: "Brittani can come and take those kids at any time as the writer did not have anything legally stopping her. The police again declined to place the kids on the hold."

36. Despite acknowledging that she lacked legal authority to withhold the child, Defendant Kekulah, acting under the authority of Washington County, retained physical custody of R.T. between approximately 11:25 a.m. and 3:52 p.m. on September 8, 2022, without a court order, parental consent, or a valid 72-hour hold.

37. Defendants Kekulah and Washington County did not return R.T. to Plaintiff's care.

**The Interception at John Glenn Middle School**

38. Oakdale Police CAD records reflect that Washington County Community Services "planned to take [J.L.] from school and [A.T.] which is still in the hospital." Plaintiff does not have direct, firsthand evidence establishing which specific individual physically traveled to John Glenn Middle School, located in North St. Paul, Ramsey County, Minnesota, to carry out that plan. In June 2026 correspondence, Defendant Galvin stated "So we were pretty sure it was a Washington County worker who came in so you may want to reach out to that agency." regarding the individual who came to the school for J.L. on September 8, 2022; she did not identify that individual by name.

39. At the conclusion of the school day, J.L. departed his classroom and boarded his scheduled school bus to return home.

40. Without notifying Plaintiff, and without a warrant, court order, or parental consent, Defendant Assistant Principal Marnie Galvin boarded the bus to intercept J.L. and removed him from the vehicle.

41. Defendant Galvin surrendered physical custody of J.L. without verifying any active child protection emergency documentation, and subsequently allowed him to be turned over to an extended relative who did not possess legal custody or guardianship rights.

42. At the time of the minor's release, the extended relative was not listed on school enrollment documentation or emergency contact records as an authorized individual permitted to take custody of J.L., nor did school personnel obtain authorization from Plaintiff.

43. The unauthorized nature of this release is confirmed by January 2024 school records in which Plaintiff first granted formal permission for the aunt to be an authorized contact, at which time Defendant Galvin noted she would then "add her into our student system"—confirming the relative held no such authorized status during the September 2022 seizure.

44. In June 2026 correspondence, Defendant Galvin admitted that school protocol requires any person picking up a student to show ID and "be listed on the student's Campus account… in order for them to leave."

45. By surrendering J.L. to an unauthorized relative not on said account, Defendant Galvin appears to have acted inconsistently with the District's stated safety and security protocols.

46. Following the removal of J.L. from the school bus, Defendant Kekulah recorded in the official county logs that she still "needed to go and work on getting a 72-hour hold placed on these kids."

47. Upon realizing that J.L. had been intercepted from school and had not arrived home on his scheduled bus, Plaintiff placed multiple phone calls to family members and county personnel to ascertain the location and legal status of her minor children, as Defendant Kekulah had left the residence without providing a warrant, emergency hold forms, or administrative paperwork.

**The Custodial Interrogation at the Hotel and Hold Documentation**

48. Following the removals from the home and school, the minor children were transported to a local hotel. At the hotel location, state actors subjected Plaintiff's minor child, J.L., to a custodial interrogation regarding Plaintiff's medical condition and household without Plaintiff's prior knowledge, consent, or the presence of legal counsel.

49. Defendant Kekulah subsequently contacted Oakdale Police Detective Kimberly Coffey regarding the hold.

50. According to Defendant Kekulah's case notes and Defendant Russell's submitted court report, "SW Kekulah was able to get Office Coffee [sic] to place the children on a 72-hr hold."

51. According to Oakdale Police Captain Steve Goodwin's email response in 2023, and as reflected in the physical hold form, Detective Coffey directed that Officer Koethe meet Defendant Kekulah to execute the 72-hour paperwork.

52. Official CAD records document that Officer Koethe was dispatched to the hotel at 3:17 p.m. and completed the incident at 3:52 p.m., establishing that the 72-hour hold form was executed at the hotel location after the initial physical removal of the minor children had taken place.

53. In executing this document, law enforcement cited a juvenile delinquency arrest statute under Minnesota Statutes Chapter 260B, rather than the child protection emergency authority under Chapter 260C. The minors were processed under a delinquency arrest protocol despite the fact that none of Plaintiff's minor children were accused of a criminal offense or fell under the statutory jurisdiction of Chapter 260B.

54. Furthermore, the sections on the face of the emergency hold form designated for detailing the "reasonable cause," "factual justification," or "imminent danger" supporting the immediate seizure of the children were left factually devoid of the statutory justifications required by law.

55. The official hold form lists the effective backdated time of the children taken into custody as 11:25 a.m.

56. Official Oakdale Police CAD logs document that the initial dispatch call regarding this incident was received at 11:25:26 a.m., and Officer Koethe did not arrive on scene until approximately 11:43 a.m.

57. Plaintiff was not served with or shown legal documentation or hold paperwork during the physical removal of her children.

**Discrepancies Between Contemporaneous Records and Subsequent Court Filings**

58. On September 13, 2022, Defendant Russell filed a CHIPS petition in Washington County District Court. The petition stated that "when officers arrived at the home, they reported to SW Kekulah that they have dealt with [associate] in the past, that he is dangerous, and that he can be volatile."

59. The contemporaneous CAD records do not reflect officers independently providing those characterizations to Defendant Kekulah prior to the removal.

60. The CAD reports attribute the description of [Associate] as "volatile" to Defendant Kekulah.

61. The CHIPS petition did not reference Officer Koethe's refusals to place an emergency hold, the Kwik Trip meeting where Defendant Kekulah documented that she "did not have anything legally stopping" Plaintiff from retaining custody, or the fact that Defendant Kekulah contemporaneously recorded that Plaintiff "can come and take those kids at any time."

62. The CHIPS petition characterized Plaintiff as appearing "very thin and small for an adult her age."

63. At the time of the alleged observation, Plaintiff was less than two weeks postpartum following the birth of her daughter.

64. The petition did not reference that Plaintiff was recovering from multiple emergency surgical procedures.

65. The petition did not state Plaintiff had been denied an opportunity to consult counsel, or that Plaintiff had requested Defendant Kekulah leave the residence on three separate occasions.

66. The CHIPS petition did not reference the contemporaneous medical observations of Dr. Fahim, who documented that Plaintiff's behavior was "appropriate, affectionate, and caring" and characterized the separation as "unusual, extreme and unwarranted."

67. The petition also did not reference that the infant's toxicology results were consistent with Plaintiff's prescribed medication and hospital-administered treatment.

68. In gathering information for, drafting, and submitting the CHIPS Petition, Defendants Russell and Kekulah omitted material evidence of Plaintiff's active, documented availability and cooperation—including Defendant Russell's own in-person visit with Plaintiff in Hospital Room 216 on September 4, 2022, and Plaintiff's subsequent September 7 email confirming her discharge, thereby presenting a misleading narrative to the court that Plaintiff was unreachable and uncooperative.

69. Plaintiff alleges that the omission of this material information and the submission of a factually incomplete narrative affected the fairness of the proceedings from the moment the petition was filed, independent of the state court's subsequent adjudication.

**Record-Keeping and MGDPA Responses**

70. Under Minnesota Statutes § 260B.176, Subd. 2, and parallel provisions under Chapter 260C, Defendants Kekulah, Koethe and the City of Oakdale possessed a statutory duty to provide Plaintiff with a copy of the emergency hold forms and written notice detailing the grounds for her children's removal.

71. In December 2023, Plaintiff submitted a written records request to the Oakdale Police Department via electronic mail, explicitly stating: "Hello, I am looking to receive all reports available from 9/8/22 of an incident of responding law enforcement to my home address of [Plaintiff's residence address]. Additionally, on the same day, Oakdale PD did a 72 hour emergency hold on my children at a local hotel. I would like all information available. How do I go about receiving these reports? Thanks in advance! Best, Brittani Larson"

72. In response to this direct December 2023 request, Oakdale Police Department records personnel did not transmit the underlying emergency hold instruments, transmitting only an initial officer CAD summary report stating that law enforcement "stood by" while county workers took custody.

73. In June 2026, Plaintiff initiated a formal public records request under the Minnesota Government Data Practices Act (MGDPA). The Oakdale Police Department partially fulfilled this request in July 2026, releasing the CAD notes and the underlying physical hold paperwork, while noting that the remainder of Plaintiff's systemic policy requests would be forwarded to the Chief of Police.

74. Plaintiff did not receive or gain access to the underlying 72-hour hold forms until this July 2026 MGDPA production was completed. Upon receiving the paperwork, Plaintiff discovered that her children had been processed under an inapplicable delinquency statute (Chapter 260B) and that the officer's written justifications for the emergency hold were factually devoid of the statutory justifications required by law.

75. Plaintiff did not receive the underlying 72-hour hold forms until the July 2026 MGDPA production. Defendants did not provide these mandatory administrative instruments in response to Plaintiff's December 2023 records request or during the active state court proceedings.

**Subsequent Events and Contradictory Medical Records**

76. Prior to the removal, Defendant Russell communicated with Plaintiff at the hospital and was aware of Plaintiff's recent emergency surgical procedures and inpatient status.

77. Later submissions referenced contact attempts at Plaintiff's residence. At the times referenced, Plaintiff was physically confined to a medical facility under active inpatient care or just being discharged. The submissions did not reference Plaintiff's inpatient hospitalization status, her recent emergency surgical procedures, or her electronic communications with county personnel. The submissions also did not reference that law enforcement had twice declined to place an emergency hold on the children.

78. On September 4, 2022, Defendant Russell communicated directly with Plaintiff in Plaintiff's inpatient hospital room (Room 216) at M Health Fairview St. John's Hospital. Defendant Russell was fully aware of Plaintiff's ongoing medical care, active inpatient status, and physical location.

79. On September 6, 2022, Plaintiff was discharged from the hospital and returned home to continue recovering.

80. On September 6, 2022, two days prior to the intake visit, Defendant Russell contacted hospital staff to request a meeting to 'discuss a disposition plan for the baby' in person, indicating the removal was planned before any assessment of the home was conducted.

81. September 7, 2022, at 1:19 PM nearly 24 hours before the home visit, Defendant Russell declared that the 'Patient is NOT able to stay with MOB' [Mother of Baby] and informed staff she had 'started the paperwork for placement of baby in foster care.'

82. These extrajudicial directives were enforced via a 'sticky note' in the infant's chart stating 'parental visits would be suspended' and 'parents CANNOT come visit,' despite the hospital recording as late as 5:06 PM on September 8 that hold paperwork had still not been received.

83. On September 7, 2022, at 9:02 PM, Plaintiff sent an electronic mail message directly to Defendant Russell confirming her discharge, explaining she was recovering at home, and offering full availability to meet on September 8 and September 9.

84. Defendants ignored Plaintiff's direct written communication and proceeded with the September 8 home visit without referencing Plaintiff's September 7 email confirming her discharge and availability.

85. On September 12, 2022, Plaintiff sent a written electronic communication to Defendant Russell stating: "I'm unsure why communication stopped once my children were abruptly taken from me? I'm also not sure why reasonable services weren't offered to me? There is no reason my children were unable to stay at home. If the problem is [associate], then he leaves. Not my children. He doesn't live at my home, he has no key of entry. Contrary what others believe at this point, he's far from perfect but he's not violent and not a threat to my children, or household."

86. While attempting to maintain contact with the agency regarding her children, Plaintiff sent a written electronic communication to Defendant Russell on September 13, 2022, writing: "I am unsure why I was left out of this critical decision making in regards to my children? That said, when can I see them? How does this work?"

87. On September 12, 2022, Defendant Russell issued a formal 'To Whom It May Concern' letter on Washington County letterhead. The letter stated that the foster parent was 'authorized by court order' to provide for and sign medical authorizations for R.T. The letter also states that the parents of R.T., only have court ordered supervised contact and cannot transport R.T. independently.

88. Plaintiff alleges that no such court order had yet been entered because the Emergency Protective Care hearing occurred the following day, September 13, 2022.

89. The infant's treating neonatologist, Dr. Nancy Magdy Adly Fahim, documented in the certified medical charts that Plaintiff's toxicology results were consistent with her prescribed medication and hospital-administered treatment.

90. Dr. Fahim documented in the medical records that Plaintiff's behavior was "appropriate, affectionate, and caring" and characterized the emergency separation of mother and child as "unusual, extreme and unwarranted." Dr. Fahim subsequently testified to these factual observations at an evidentiary hearing.

**Administrative Notice and Document Maintenance History**

91. Throughout the pendency of the child protection proceedings, Plaintiff engaged in a documented effort to correct factual inaccuracies and material omissions within the county's records and reports. Between November 2022 and June 2024, Plaintiff sent multiple written communications to her legal counsel, Guardian ad Litem Nancy Cottrell, and social work personnel including Jane Lindstrom and Kathryn Bursinger identifying specific material errors. These included the misidentification of the removing intake worker, the omission of compliant toxicology screens and efforts made by Plaintiff, and the repetition of inaccurate medical rationales regarding the infant's hospital stay that had already been corrected by the treating neonatologist.

92. Despite receiving written notice of these material discrepancies, Washington County personnel incorporated the challenged information into subsequent reports and case plans.

93. On March 28, 2023, Plaintiff sent a formal written notification via email to Washington County Community Services Division Director Sarah Amundson, copying Plaintiff's attorney and caseworker, Kathryn Bursinger, thereby placing the agency on notice of specific constitutional and statutory violations, including the lack of a concurrent legal hold during the physical removal, the absence of credentials, the refusal to leave the home upon request, and the coercion used regarding relative placement eligibility.

94. The email notification further alerted Director Amundson to a conflict of interest, noting that Defendant Kekulah–the individual who executed the physical removal–had been promoted to a supervisory role directly overseeing Plaintiff's ongoing case worker, Kathryn

Bursinger. Director Amundson did not respond or alter Defendant Kekulah's supervisory assignment over the file.

95. Washington County social workers altered family communication access by instructing placement providers to limit contact. Specifically, on September 12, 2022, the designated family placement caregiver for minor child R.T. communicated in writing to Plaintiff: "I just didn't respond because they told me I couldn't but that changed today," documenting direct interference with Plaintiff's parent-child relationship by Washington County personnel.

96. On September 8, 2022, upon executing the removal of Plaintiff's minor children, Washington County personnel surrendered physical custody of the children to Plaintiff's mother without conducting relative safety screening or physical capability assessments required by state child welfare protocols.

97. Washington County's administrative records document that Defendant Russell suspended Plaintiff's access and visitation rights to her newborn infant, A.T., while the minor remained inpatient in the hospital Neonatal Intensive Care Unit (NICU), noting a suspension date of September 7, 2022. Plaintiff alleges that this administrative suspension occurred one day prior to the intake home visit executed by Defendant Kekulah on September 8, 2022.

98. Prior to the execution of any 72-hour peace officer hold form or judicial order, Defendants Russell and Washington County issued extrajudicial directives directly to hospital staff instructing that Plaintiff's parental visitation rights be suspended and restricted. Defendants lacked statutory authority under Minnesota law to unilaterally strip or restrict Plaintiff's fundamental constitutional rights to associate with and care for her newborn child prior to a valid court order or signed statutory hold.

**The Separation and Dispersal of the Minor Children**

99. Following the expiration of the initial 72-hour hold period, Washington County personnel separated the three minor children and placed them across three separate municipal zip codes.

100. Minor child J.L. was placed by the county in Eveleth, Minnesota, in the physical custody of his biological father. While in this placement, J.L. sustained a physical fracture to his arm, which remained without diagnostic X-ray imaging or medical treatment for a period of two weeks, despite communications from Plaintiff directing that the minor receive immediate medical attention.

101. Due to the geographic dispersal and administrative placement directives maintained by the county, Plaintiff had no physical contact with minor child J.L. for a consecutive period of 31 days following the initial removal. Plaintiff was entirely separated from physical contact with minor child R.T. for 16 days, and minor child A.T. for 15 days.

102. Plaintiff did not regain full custody of minor child J.L. and minor A.T. until December 2023. Minor child R.T. remained in an alternative placement.

103. The state child protection proceedings have concluded with the entry of final orders. Plaintiff does not seek to overturn, modify, or otherwise challenge those orders in this action. Plaintiff seeks solely retrospective monetary damages for the independent constitutional violations alleged herein.

## V. CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 – Deprivation of Parental Liberty Interest and Familial Integrity (In Violation of the Fourteenth Amendment Substantive Due Process Clause) (Against Defendants Kekulah, Koethe, Coffey, and Galvin in their individual capacities)

104. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105. Plaintiff Brittani Larson possesses a clearly established fundamental liberty interest protected by the substantive Due Process Clause of the Fourteenth Amendment in the care, custody, companionship, and management of her minor children. See Swipies v. Kofka, 348 F.3d 701, 703-04 (8th Cir. 2003) ("Parents have a liberty interest in the care, custody, and management of their children.").

106. Plaintiff is proceeding pro se solely with respect to her own personal constitutional claims. She is not appearing on behalf of her minor children and does not assert any claims belonging to them.

107. On September 8, 2022, Defendants Kekulah, Koethe, and Coffey, acting under color of state law, removed Plaintiff's minor child R.T. from Plaintiff's custody and from Plaintiff's home without a warrant, court order, or reasonable suspicion of abuse or imminent danger to the child. This action unconstitutionally interfered with Plaintiff's protected liberty interest in maintaining the integrity of her family unit.

108. On September 8, 2022, Defendant Galvin, acting under color of state law and in coordination with Washington County Community Services personnel who had planned J.L.'s removal from school that day, removed Plaintiff's minor child J.L. from school grounds and surrendered him to an unauthorized relative without a warrant, court order, or Plaintiff's consent, further depriving Plaintiff of her parental liberty interest and right to direct the upbringing and welfare of her child.

109. At all relevant times, no exigent circumstances justified the immediate seizure and separation of Plaintiff's children from her care. Law enforcement had twice declined to authorize an emergency hold, and Defendant Kekulah herself documented that she "did not have anything legally stopping" Plaintiff from retaining custody, thereby demonstrating the absence of any reasonable suspicion required to justify the removal under the Eighth Circuit's clearly established law. See Swipies, 348 F.3d at 703-04.

110. Defendant Kekulah further subjected J.L. to an isolated, custodial interrogation regarding Plaintiff's medical condition and household affairs without Plaintiff's prior knowledge, consent, or the presence of counsel. This conduct independently interfered with Plaintiff's fundamental right to direct the upbringing, education, and welfare of her child.

111. The emergency hold form subsequently executed was backdated to 11:25 a.m., cited an inapplicable juvenile delinquency statute (Chapter 260B), and contained no articulable facts supporting reasonable suspicion or imminent danger.

112. As a direct and proximate result of Defendants' unconstitutional interference with Plaintiff's parental liberty interest, Plaintiff has suffered severe emotional distress, mental anguish, trauma, loss of familial association, and the destruction of her parent-child bond. These injuries are personal to Plaintiff and are not derivative of any claim belonging to her children.

**COUNT II: 42 U.S.C. § 1983 – Deprivation of Procedural Due Process and Familial Interference (In Violation of the Fourteenth Amendment Procedural Due Process Clause) (Against Defendants Russell and Kekulah in their individual capacities)**

113. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

114. Plaintiff Brittani Larson possesses a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment in the care, custody, and management of her minor children.

115. Defendants Russell and Kekulah deprived Plaintiff of her fundamental liberty interest in familial integrity without procedural due process by, among other things:

(a) ratifying and failing to remediate the warrantless, extrajudicial removal of her children after receiving formal written notice and a request for intervention on March 28, 2023;

(b) issuing extrajudicial directives to medical staff to restrict and suspend Plaintiff's parental visitation prior to any executed hold or court order;

(c) misrepresenting Plaintiff's inpatient hospitalization status to create the impression of unreachability and pre-determine foster placement;

(d) failing to immediately serve Plaintiff with mandatory written statutory notices of the hold;

(e) withholding underlying hold instruments throughout active state court proceedings and targeted records requests;

(f) maintaining and incorporating information into subsequent reports and proceedings after receiving written communications from Plaintiff regarding specific factual discrepancies; and

(g) falsely representing the existence of judicial orders to third parties and foster placements prior to any court hearing being held, thereby stripping Plaintiff of her legal rights to direct the care of her children through administrative misrepresentation.

116. Defendants Russell and Kekulah further interfered with Plaintiff's procedural protections and right to familial association by directing placement caregivers not to communicate with Plaintiff and by effectuating the long-term geographical separation and dispersal of the children across distant zip codes, thereby isolating her from her children and support network.

117. As a direct and proximate result of Defendants' procedural failures and continuing course of conduct, Plaintiff was separated from her children, causing severe emotional, psychological, and physical family trauma.

**COUNT III: 42 U.S.C. § 1983 – Monell Municipal Liability for Defective Training, Customs, and Policies (Against Defendants Washington County, City of Oakdale, and ISD 622)**

118. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

119. The constitutional injuries inflicted upon Plaintiff were the result of policies, administrative customs, practices, and failures to train maintained by Washington County, the City of Oakdale, and Independent School District 622.

120. Defendant City of Oakdale maintains a training protocol and custom regarding the statutory boundaries of 72-hour peace officer holds, a systemic deficiency acknowledged in writing by police command leadership as a "matter of education on the officers part" involving "shortcomings." This deficiency led to the use of incorrect criminal statutes and forms factually devoid of the justifications required by law to execute warrantless seizures of non-delinquent minors. This deficiency was further maintained by record-keeping customs that resulted in the withholding of the hold forms during Plaintiff's initial 2023 discovery attempts. The City's failure to adequately train officers on the constitutional limits of child removal and the proper statutory authority for emergency holds was a moving force behind the constitutional injury to Plaintiff.

121. Defendant Washington County maintains an administrative custom, policy, and practice of deliberate indifference by ratifying warrantless, extrajudicial police removals, assigning a primary intake worker to a supervisory capacity over an active case file in which she was a participant, surrendering minor children to family placements without prior relative assessment, and causing prolonged geographic sibling separations without adequate medical or safety oversight. Washington County's deliberate indifference to Plaintiff's constitutional rights is further evidenced by its failure to investigate or remediate the violations after receiving formal notice from Plaintiff on March 28, 2023.

122. Defendant ISD 622 maintains an unconstitutional practice and failure to train that permits school administrators to remove and surrender student minors from transit vehicles and school grounds to external state actors without requiring verification of a warrant, court order, or valid child welfare emergency documentation. The risk that an unauthorized adult could remove a student from school grounds without proper authorization is a highly predictable consequence of failing to train administrators on student-release protocols. See L.R. v. School District, 60 F. Supp. 3d 584 (E.D. Pa. 2014). The District's own written protocols require ID verification and authorized status in the student system, yet the District failed to ensure compliance with these protocols, resulting in the unconstitutional deprivation of Plaintiff's parental liberty interest.

123. The municipal defendants acted with deliberate indifference, and their policies, customs, and training failures were the moving force behind the constitutional injuries suffered by Plaintiff.

## VI. PRAYER FOR RELIEF

**WHEREFORE, Plaintiff Brittani Larson respectfully requests that this Court enter judgment in her favor and against the Defendants, granting the following relief:**

(A) Compensatory Damages against all Defendants as permitted by law, jointly and severally, in an amount to be determined at trial, to compensate Plaintiff for emotional distress, mental anguish, family separation, loss of familial association, and the violation of her civil rights;

(B) Punitive Damages against the individual Defendants (Russell, Kekulah, Coffey, Koethe, and Galvin) in their individual capacities, in an amount to be determined at trial, for conduct demonstrating an indifference to Plaintiff's federally protected constitutional rights; provided that municipal Defendants shall not be liable for punitive damages;

(C) Taxable costs, filing fees, and other recoverable litigation expenses as permitted by law;

(D) Such other and further relief as this Court deems just and proper; and

(E) Plaintiff seeks solely monetary damages for independent constitutional torts and does not seek modification, reversal, or appellate review of any underlying state court family custody judgments.

## JURY DEMAND

Plaintiff Brittani Larson hereby demands a trial by jury on all counts, claims, and issues so triable in this action.

Dated: 8/21/26

Respectfully submitted,

Brittani Larson

BRITTANI LARSON, Plaintiff Pro Se

4980 Hamlet Ave N. #213 Oakdale, MN 55128 | 651-323-1117 | btclarson@gmail.com