**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| BRITTANI LARSON,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON COUNTY; CITY OF OAKDALE; INDEPENDENT SCHOOL DISTRICT 622; SOCIAL WORKER TITI RUSSELL, in her individual capacity; SOCIAL WORKER QUEETA KEKULAH, in her individual capacity; OAKDALE POLICE DETECTIVE KIMBERLY COFFEY, in her individual capacity; OAKDALE POLICE OFFICER NICHOLAS KOETHE, in his individual capacity; JOHN GLENN MIDDLE SCHOOL ASSISTANT PRINCIPAL MARNIE GALVIN, in her individual capacity,<br><br>Defendants. | Case No. 26-cv-3736 (KMM/JFD)<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

1. This action arises from the September 8, 2022 removal of Plaintiff's minor children following Plaintiff's emergency hospitalization for severe preeclampsia, a premature natural birth caused by the preeclampsia, her readmission to the hospital and emergency surgery following delivery, and continued medical treatment. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress violations of rights secured by the United States Constitution.

2. Plaintiff Brittani Larson is appearing pro se. Plaintiff asserts only her own personal constitutional claims. She does not appear on behalf of her minor children or assert any claims belonging to them.

3. Plaintiff brings this action solely for monetary damages and related relief for independent constitutional torts that occurred prior to and separate from any state-court

adjudication. Plaintiff does not seek to overturn, modify, set aside, or in any way disturb the judgments, orders, or outcomes of any state court child-protection proceedings, all of which have concluded. This Court's jurisdiction is invoked solely to redress injuries caused by the individual defendants' extrajudicial conduct, not to review or reject any state court determination.

4. Plaintiff does not challenge the authority of child-protection agencies or law enforcement to intervene when children face an immediate threat to their safety. Nor does Plaintiff contend that government officials violate the Constitution merely by initiating a child-protection investigation or seeking judicial review when supported by law and fact.

5. Rather, Plaintiff alleges that Defendants Russell, Kekulah, and Koethe exercised extrajudicial governmental custody over her children in the field before documented legal authority existed to do so and failed to include in subsequent court filings information documented in contemporaneous records. Plaintiff further alleges that Washington County Community Services printed, distributed, and kept in use the 72-hour hold form (WCCS-71040-8) on which her children were held on September 8, 2022, that the form cited a juvenile delinquency statute and stated no supporting facts, and that the form is directly connected to the injuries alleged in this Amended Complaint, as set out in Count III.

6. Plaintiff further alleges that Defendants Russell and Washington County possessed contemporaneous medical information concerning Plaintiff's hospitalization, recovery, and interactions with her newborn daughter that was relevant to decisions affecting Plaintiff's parental rights. Plaintiff alleges that this information, including observations documented by Plaintiff's treating neonatologist, was not reflected in the information presented during the initial stages of the child-protection proceedings.

7. Plaintiff also alleges that her oldest child was removed from school grounds by Defendant Galvin, in coordination with Washington County Community Services personnel, under circumstances that raise independent constitutional questions separate from the events occurring at Plaintiff's residence earlier that day.

8. This case therefore presents discrete constitutional questions concerning the exercise of field-based governmental authority by the Individual Defendants, including the timing and legal basis for the physical seizure of Plaintiff's children, the adequacy of procedural protections afforded to Plaintiff, the accuracy and completeness of information utilized during administrative proceedings, and the conduct of individual governmental actors participating in those events.

9. Plaintiff seeks compensatory damages against all Defendants; punitive damages against Defendants Russell, Kekulah, Koethe, and Coffey in their individual capacities, but not against Defendant Galvin or the municipal Defendants; and such additional relief as this Court deems just and proper.

10. This First Amended Complaint ("Amended Complaint") is filed as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B), within 21 days after service of Defendants' motions under Rule 12(b). It supersedes the original Complaint filed August 21, 2026, and is complete in itself.

## II. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this action arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

12. Venue is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred within this judicial district, specifically within Washington County and Ramsey County, Minnesota.

## III. THE PARTIES

13. Plaintiff Brittani Larson is an adult individual residing in Oakdale, Minnesota, and is the natural mother of the minor children subject to the removals described herein: R.T. (age 18 months at the time of the incident), J.L. (age 11 at the time of the incident), and A.T. (a newborn infant at the time of the incident).

14. Defendant Washington County is a political subdivision and municipal corporation organized under the laws of the State of Minnesota, responsible for the administration, policies, customs, training, and oversight of the Washington County Community Services Department and its child protection personnel.

15. Defendant City of Oakdale is a municipal corporation organized under the laws of the State of Minnesota, responsible for the operation, training, policies, and customary practices of the Oakdale Police Department.

16. Defendant Social Worker Titi Russell was at all times relevant employed by Washington County as a child protection worker. She was the primary worker assigned to Plaintiff's family from approximately September 2, 2022 until Plaintiff was transferred to an ongoing worker on or about September 20, 2022. She is sued in her individual capacity.

17. Defendant Social Worker Queeta Kekulah was at all times relevant employed by Washington County as a child protection worker. She is sued in her individual capacity.

18. Defendant Oakdale Police Detective Kimberly Coffey was at all times relevant a licensed law enforcement officer employed by the Oakdale Police Department. She is sued in her individual capacity.

19. Defendant Oakdale Police Officer Nicholas Koethe was at all times relevant a licensed law enforcement officer employed by the Oakdale Police Department. He is sued in his individual capacity.

20. Defendant Independent School District 622 (ISD 622) is a public school district organized under the laws of the State of Minnesota, operating John Glenn Middle School, and responsible for the administrative policies, training, customs, and security protocols governing the custody, care, and release of student minors to third parties.

21. Defendant Marnie Galvin was at all times relevant employed by ISD 622 as the Assistant Principal of John Glenn Middle School. She is sued in her individual capacity.

22. At all times relevant to this Amended Complaint, each individual Defendant acted under color of state law.

## IV. FACTUAL ALLEGATIONS

### A. Events Preceding the September 8, 2022 Home Visit

23. On August 27, 2022, Plaintiff developed severe preeclampsia, a dangerous pregnancy complication characterized by critically high blood pressure. As a direct result, Plaintiff's doctors induced labor prematurely to prevent maternal and fetal mortality.

24. A.T. was born prematurely and required admission to the Neonatal Intensive Care Unit (NICU) because of her premature birth.

25. On or about September 5, 2022, Defendant Russell communicated directly with Plaintiff in Plaintiff's inpatient hospital room (Room 216) at M Health Fairview St. John's

Hospital. Defendant Russell was fully aware of Plaintiff's ongoing medical care, recent emergency surgical procedures, active inpatient status, and physical location.

26. On September 6, 2022, Plaintiff was discharged from the hospital and returned home.

27. On September 6, 2022, two days prior to the intake visit, Defendant Russell contacted hospital staff to request a meeting to "discuss a disposition plan for the baby" in person.

28. On September 7, 2022, at 1:19 PM, nearly 24 hours before the home visit, Defendant Russell declared that the "Patient is NOT able to stay with MOB" [Mother of Baby] and informed staff she had "started the paperwork for placement of baby in foster care."

29. Washington County's administrative records and medical records document that Defendant Russell suspended Plaintiff's access and visitation rights to her newborn infant, A.T., while A.T. remained an inpatient in the hospital NICU, noting a suspension date of September 7, 2022, one day before the intake home visit conducted by Defendant Kekulah on September 8, 2022. The suspension was enforced through a "sticky note" in A.T.'s chart stating "parental visits would be suspended" and "parents CANNOT come visit," and it remained in effect. See paragraphs 94–95.

30. Defendants Russell and Washington County imposed the suspension by issuing extrajudicial directives directly to hospital staff. On September 7, 2022, when they did so, no court had issued any order concerning Plaintiff's children, no peace officer had taken any of them into custody, and no 72-hour hold had been executed.

31. On September 7, 2022, Defendant Russell left a card bearing her email address at Plaintiff's door. At 9:02 PM that evening, Plaintiff sent an electronic mail message directly to

Defendant Russell. She wrote, “Sorry about the phone tag the past couple days! I thought I would email to make it easier,” stated that she had been “discharged from the hospital yesterday afternoon,” said she was available most of the next day and on Friday, September 9 to meet, and reported that A.T. was “doing well and making great progress everyday.”

**B. The Removal and Timeline Sequence (September 8, 2022)**

32. On September 8, 2022, Plaintiff Brittani Larson was at her residence in Oakdale, Minnesota, caring for R.T. and recovering from multiple recent emergency surgical procedures, including a diagnostic laparoscopy, drainage of an intra-abdominal abscess, a laparoscopic appendectomy, and lysis of adhesions. Her treating physicians had discharged her to home on September 6, 2022 (paragraph 26). That morning, the adult associate, who is the father of R.T. and A.T., came to Plaintiff’s home to take part in the County’s visit because it concerned his children.

33. Defendant Washington County Social Worker Queeta Kekulah arrived at Plaintiff’s residence to conduct an intake home visit in place of the primary assigned worker, Defendant Titi Russell. Within minutes of arriving, Defendant Kekulah telephoned Defendant Russell twice to confirm statements she had made about Plaintiff, and Defendant Russell corrected her.

34. The September 8 visit was an intake home visit and family assessment that Washington County Community Services had planned in advance. No child exhibited any injury or sign of physical abuse during the visit. None of the records produced to Plaintiff, including the CAD records, the 72-hour hold form, Defendant Kekulah’s written statement, and the CHIPS petition, states that any person observed Plaintiff to be impaired or under the influence of any substance during the visit.

35. Defendant Kekulah did not present physical identification or credentials upon request, stating she lacked business cards, and communicated that she held a supervisory role within the department.

36. Defendant Kekulah asked Plaintiff and an adult associate to provide drug screens.

37. Plaintiff had already expressed concerns regarding the test results being relied upon by Defendants and requested an opportunity to consult with legal counsel before complying. Defendant Kekulah denied that request and stated that the removal of the children would proceed. Defendant Kekulah told Plaintiff that if Plaintiff and the associate did not take a drug test, she would take the children.

38. Plaintiff also asked Defendant Kekulah for a copy of the test results. Defendant Kekulah did not provide them and told Plaintiff to ask the hospital.

39. On three separate occasions during the visit, Plaintiff, the adult associate, and Plaintiff's mother requested that Defendant Kekulah depart the residence. Defendant Kekulah remained on the premises.

40. Defendant Kekulah subsequently contacted the Oakdale Police Department at 11:25am (recorded in CAD logs as 11:25:26 a.m.) to request that law enforcement place Plaintiff's minor children on an emergency 72-hour health and welfare hold.

41. Defendant Oakdale Police Officer Nicholas Koethe responded to the scene.

42. Upon assessing the situation, Officer Koethe declined Defendant Kekulah's request to place the children on an emergency hold.

43. According to Defendant Kekulah's official Investigation/Family Assessment Summary notes, law enforcement instructed Defendant Kekulah and Plaintiff's mother to clear

the immediate area due to "safety concerns" regarding an associate who had already departed, while law enforcement left Plaintiff inside the residence.

44. The adult associate who was present during the visit is the father of R.T. and A.T. He did not reside at Plaintiff's home. He left the residence before Officer Koethe arrived because he had an outstanding warrant for a probation violation.

45. After Plaintiff's mother stated that they would contact legal counsel, Defendant Kekulah demanded that Plaintiff immediately pack a bag for R.T., rejecting Plaintiff's offer that R.T. stay with her. Defendant Koethe rushed Plaintiff, stating that he did not have all day and that there was no time to wash bottles. Plaintiff did not consent to R.T.'s removal.

46. Plaintiff was given about five minutes to get R.T. ready. Defendant Kekulah then took physical custody of R.T. and departed with her and Plaintiff's mother, while law enforcement, including Defendant Koethe, "stood by." R.T. was eighteen months old. Plaintiff's newborn, A.T., remained in the hospital.

47. Defendant Kekulah and Plaintiff's mother drove to a nearby Kwik Trip convenience store.

48. At the Kwik Trip location, Defendant Kekulah renewed her request that an Officer authorize an emergency hold on the minor children. The officer declined the request a second time.

49. Defendant Kekulah recorded the following entry in the official county Investigation/Family Assessment Summary: "*Brittani can come and take those kids at any time* as the writer did not have anything legally stopping her. The police again declined to place the kids on the hold." (emphasis added).

50. Despite acknowledging in her own record that she “did not have anything legally stopping” Plaintiff from taking R.T. back, Defendant Kekulah, acting under the authority of Washington County, retained physical custody of R.T. without Plaintiff’s consent. Defendants Kekulah and Washington County did not return R.T. to Plaintiff’s care.

51. Defendant Kekulah is not a peace officer. When she took physical custody of R.T., no court had ordered that R.T. be taken into immediate custody, no warrant had issued, and no peace officer had taken R.T. into custody. See Minn. Stat. § 260C.175, subd. 1.

**C. The Oakdale Police CAD Record of the Home Visit**

52. Oakdale Police Department computer-aided dispatch (“CAD”) records for Incident No. OD22011460 reflect that Defendant Koethe, assigned to Unit 6576, arrived at Plaintiff’s residence at 11:43:58 a.m. on Thursday, September 8, 2022.

53. The same CAD records reflect that at 11:45:07 a.m., sixty-nine seconds after Defendant Koethe’s arrival, dispatch recorded Units 6593, 6576, and 6591 as “C4.”

54. Upon information and belief, “C4” (“Code 4”) is a dispatch status designation indicating that responding units reported that no further assistance was needed or that the scene was secure. Plaintiff alleges this fact upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

55. Defendant Koethe was present at Plaintiff’s residence when Defendant Kekulah took physical custody of R.T. No hold form was executed at Plaintiff’s residence.

**D. The Interception at John Glenn Middle School**

56. J.L., Plaintiff’s oldest child, was eleven years old and a student at John Glenn Middle School in North St. Paul, Ramsey County, Minnesota. Defendant Marnie Galvin was the school’s Assistant Principal.

57. The "OFFICER COMMENTS" entry in the Oakdale Police Department CAD record for Incident No. OD22011460 states: "Officer stood by as WCSS took custody of child and transported [redacted] out of area. WCSS planned to take custody of [redacted] from school and [redacted] which is still in hospital. WCSS to complete emergency placement order through WC Courts."

58. Plaintiff did not witness J.L.'s removal. J.L. and Plaintiff's aunt have each since told Plaintiff that Defendant Galvin removed J.L. from the school bus. In June 2026 correspondence responding to Plaintiff's records request under the Minnesota Government Data Practices Act ("MGDPA"), Defendant Galvin stated "So we were pretty sure it was a Washington County worker who came in so you may want to reach out to that agency." regarding the individual who came to the school for J.L. on September 8, 2022; she did not identify that individual by name. Upon information and belief, Defendant Galvin removed J.L. from the bus at the direction of Washington County personnel. Plaintiff alleges the facts in the preceding sentence upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

59. September 8, 2022 was J.L.'s third day of middle school. At the conclusion of the school day on September 8, 2022, J.L. departed his classroom and boarded his scheduled school bus to return home. J.L.'s bus assignment record, effective September 6, 2022, lists a scheduled afternoon bus from John Glenn Middle School ("H JGMpm") at 2:17 p.m.

60. Without a warrant, court order, or parental consent, Defendant Assistant Principal Marnie Galvin boarded the bus to intercept J.L. and removed him from the vehicle.

61. Defendant Galvin surrendered physical custody of J.L. without verifying any active child protection emergency documentation, and subsequently allowed him to be turned

over to an extended, out-of-state relative who did not possess legal custody or guardianship rights.

62. At the time of the minor's release, the extended relative was not listed on school enrollment documentation or emergency contact records as an authorized individual permitted to take custody of J.L., nor did school personnel obtain authorization from Plaintiff.

63. In a January 2024 email exchange with the school, Plaintiff for the first time gave formal permission for J.L.'s aunt to be an authorized contact, and Defendant Galvin responded that she would then "add her into our student system." That response is consistent with the aunt having had no authorized status on J.L.'s record in September 2022.

64. In June 2026 correspondence responding to Plaintiff's MGDPA records request, Defendant Galvin stated that school protocol requires any person picking up a student to show ID and "be listed on the student's Campus account… in order for them to leave."

65. By surrendering J.L. to an unauthorized extended out-of-state relative who was not listed on the student's Campus account, it appears Defendant Galvin did not follow the protocol she described in paragraph 64.

66. Following the removal of J.L. from the school bus, Defendant Kekulah recorded in the official county logs that she still "needed to go and work on getting a 72-hour hold placed on these kids."

67. When J.L. failed to arrive home on his scheduled school bus, Plaintiff began trying to determine his whereabouts. She called the school, although the school day had ended, and made multiple attempts to contact family members in an effort to locate her children and determine where they had been taken and under what legal authority. Defendant Kekulah had left

Plaintiff's residence without providing Plaintiff with a warrant, emergency-hold documentation, or any other paperwork authorizing or explaining the children's removal.

68. Plaintiff did not know where J.L. had been taken or why he had not arrived home as scheduled. With no information about his whereabouts, Plaintiff came close to calling law enforcement to report her son missing.

69. When Plaintiff's aunt answered the phone briefly, she told Plaintiff, "the kids are safe. We were directed not to speak to you," and ended the call. Plaintiff's mother, aunt, and sister, and the mother of another of the adult associate's children, have each since confirmed to Plaintiff that Defendants Kekulah and Russell told them not to speak with Plaintiff and that doing so could jeopardize their being considered as placement options for the children. Upon information and belief, that restriction on communication remained in place until September 12, 2022. See paragraph 144. Plaintiff alleges the fact in the preceding sentence upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

**E. The Hotel, the Hold Documentation, and Defendant Coffey's Direction**

70. Following the removals from the home and school, the minor children were transported to a local hotel. Plaintiff learned of the hotel only when J.L., using his own phone over the hotel's wifi, called her on Snapchat at 8:55 p.m. on September 8, 2022.

71. Defendant Kekulah subsequently contacted Oakdale Police Detective Kimberly Coffey regarding the hold. That contact occurred before Defendant Koethe was dispatched to the hotel at 3:17 p.m.

72. According to Defendant Kekulah's case notes, "SW Kekulah was able to get Office Coffee [sic] to place the children on a 72-hr hold." Defendant Russell's Report to Court

(paragraph 115) states the same: “SW Kekulah was able to get Office Coffee to place the children on a 72-hour hold.”

73. According to Oakdale Police Captain Steve Goodwin’s email response dated November 20, 2023, “when the hold was not signed, Social Services reached out to our investigation division, who work with them more routinely,” and “Det. K. Coffey reported once the officer was educated as to the lengths Social Service does conducting their investigations, the hold was signed.” The hold form was executed by Officer Koethe. See paragraph 77.

74. Defendant Coffey was not present at Plaintiff’s residence on September 8, 2022, and did not speak with Plaintiff. Upon information and belief, she did not speak with any of the children and did not independently investigate whether any emergency existed before she directed Officer Koethe to execute the hold paperwork. Plaintiff alleges the facts in the second sentence of this paragraph upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

75. Defendant Coffey’s own account, as relayed by Captain Goodwin (paragraph 73), is that Social Services reached out to her because the hold had not been signed, and that the hold was signed after she explained to the officer the lengths Social Services goes to in its investigations. Defendant Coffey therefore knew, when she directed Officer Koethe to execute the hold paperwork, that the officers who had been on scene had declined to do so.

76. Defendant Coffey communicated her direction to Officer Koethe by radio, telephone, or in person. Upon information and belief, Defendant Coffey’s communications with Defendant Kekulah and Officer Koethe on September 8, 2022 are recorded in dispatch audio maintained by Washington County, or in telephone records or internal communications of the Oakdale Police Department, that are in Defendants’ exclusive possession. Plaintiff alleges the

facts in the second sentence of this paragraph upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

***The 72-Hour Hold Form***

77. Official CAD records document that Officer Koethe was dispatched to the hotel at 3:17 p.m. and completed the incident at 3:52 p.m., establishing that the 72-hour hold form was executed at the hotel location after the initial physical removal of the minor children had taken place. Defendant Koethe signed the form at the hotel. It bears his name, badge number, and signature and states: "I, Nick Koethe, a duly authorized peace officer in the State of Minnesota, by reason of the authority vested in me by Minnesota State Statute 260B.175, Subd., 1, have taken into custody the following child(ren)." The form continues: "Having taken the child(ren) into custody, I am now requesting that Washington County Community Services assume custody on my behalf until such time as further action can be taken to safeguard the health and welfare of the child(ren)."

78. The form bears, in its upper right corner, the control mark "WCCS-71040-8 (4-09) 4p." Upon information and belief, the mark identifies the form as one produced and distributed by Washington County Community Services, in the edition dated April 2009, and the form was in use in substantially the same version from approximately April 2009 through September 8, 2022. Plaintiff alleges the facts in the second sentence of this paragraph upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

79. At 3:48 p.m. on September 8, 2022, Defendant Koethe wrote and initialed ("NK 9/8/22 1548") an Oakdale Police Department "Citizen Written Statement" for Case No. OD22011460, on which he is identified as the investigating officer, recording Defendant Kekulah's account. The statement says that County staff "have been trying to get a hold of

Brittani and have been unable," and that "[p]rior to the police coming to the home, [the associate] ran away on foot." It says Plaintiff "refused to give a drug test," and it states that the children are not safe with their parents, who "are believed to be" actively using methamphetamine, without citing any test result.

80. The handwritten entries on the front of the form under "Reason(s) Why Child(ren) Taken into Custody" and "Reason(s) Why Child(ren) Placed," each followed by the initials "NK," read "drug use" and "current drug use." Other parts of those lines are redacted in the copy produced to Plaintiff. The copy states no test result, observation, or other fact supporting those entries, and no fact showing imminent danger to any child.

81. The form lists the "Date Taken into Custody" as 09/08/22 and the "Time Taken into Custody" as 1125 (11:25 a.m.), and states that Defendant Koethe himself had taken the children into custody. Defendant Koethe did not arrive at Plaintiff's residence until 11:43:58 a.m., and dispatch recorded his unit as "C4" at 11:45:07 a.m. The 11:25 a.m. time on the form is the same minute in which dispatch recorded Defendant Kekulah's call requesting a hold (paragraph 40), before any officer arrived and before R.T. was taken from the home.

82. Statutes are cited in this Amended Complaint as they read on September 8, 2022. The form executed by Defendant Koethe cites Minnesota Statutes § 260B.175, subdivisions 1 and 3, a provision of the juvenile delinquency chapter. On that date, § 260B.175, subd. 1 allowed a child to be taken into immediate custody only under a court order or warrant, in accordance with the law of arrest, or by an officer who reasonably believed the child had violated probation, parole, or other field supervision. No court order or warrant existed, and none of Plaintiff's minor children was accused of a criminal offense or alleged to be delinquent.

83. On September 8, 2022, a peace officer's authority to take a child into custody because of surroundings or conditions that endangered the child's health or welfare was in Minn. Stat. § 260C.175, subd. 1(2)(ii), in the child protection chapter, not in Chapter 260B. Plaintiff's children were nevertheless processed under a juvenile delinquency custody form.

84. The form mixes the two chapters. Its back pairs a juvenile-delinquency "36 Hour Hold" with a 72-hour category that includes "Safety (Health and Welfare)," but the only custody statute it cites is in the juvenile delinquency chapter, and it states no ground for custody under the child-protection chapter, Minn. Stat. §§ 260C.175 and 260C.176.

85. The back of the form describes two kinds of holds. A "36 Hour Hold Form" is described as "Delinquency charged within 36 hours & Officer believes delinquent needs detention in a secure or shelter facility." Under the heading "72 Hour Hold Form:", the form states "Parent refuses child's return & you called:" and lists three crisis response services, followed by "Child still needs placement (Behavior)" and "Runaway (Chronic) or Safety (Health and Welfare)." Under the heading "When not to place a child on 36 or 72 Hour Hold:" the form lists, among other items, "Parent & Child Conflict (no safety issue)" and "Crisis Response has not been called on 72 Hour holds." The back of the form does not mention child abuse or neglect, or any fact an officer must have before taking a child into custody because of a parent's alleged conduct.

86. The form's 72-hour hold instruction begins "Parent refuses child's return" (paragraph 85). On September 8, 2022, Minn. Stat. § 260C.176, subd. 1 required that a child taken into custody be released to a parent, guardian, or suitable relative unless there was reason to believe the child would endanger self or others, would not return for a court hearing, or had health or welfare immediately endangered. Plaintiff did not refuse to return any child to anyone,

and Defendant Kekulah recorded that Plaintiff "can come and take those kids at any time." Neither the hold form nor the CAD records produced to Plaintiff reflect that any crisis response service was called before the hold was executed. Plaintiff was not served with or shown legal documentation or hold paperwork during the physical removal of her children.

87. The numbered advisory item titled "Reasons why the child(ren) has been taken into custody and placed" is blank, and none of the "Notified?" boxes for items 1, 2, 3, and 5 is checked. The box stating that the parent had been informed of the placement location is checked "Yes," and the location entry appears to read only "County Social Services." The children were not at a County Social Services office; they had been taken to a hotel (paragraph 70).

88. On September 8, 2022, Minn. Stat. § 260C.175, subd. 2 required an officer who took a child into custody for relative placement or shelter care to tell the parent she could request placement with a relative and to give her a list of child welfare agencies. Section 260C.176, subd. 3 required the person who took the child into custody to advise the parent, as soon as possible, of the reasons for custody and placement, the facility's location, visiting and telephone rights, and the 72-hour limit. The form has no space to record the § 260C.175, subd. 2 notices, and its numbered advisories omit the 72-hour limit.

89. The form's numbered advisories are introduced by the words "For children of Indian Heritage per Minnesota Statute 260.771, Subd. 4." Plaintiff's children are not Indian children. Although § 260C.176, subd. 3 required substantially the same advisories for any child placed in shelter care, the form presents them as applying only to children of Indian heritage.

90. On September 8, 2022, no peace officer or County social worker told Plaintiff where any of her children had been taken, gave her a list of child welfare agencies, or told her

she could request placement with a relative. Plaintiff learned the children were at a hotel only when J.L. called her, as alleged in paragraph 70.

**F. Defendant Russell's September 7–9, 2022 Directives and the Hospital Lockout**

91. On September 8, 2022, Defendant Russell, who was working remotely and was not present at Plaintiff's residence, telephoned staff at M Health Fairview St. John's Hospital and stated that a hold was "in process."

92. During that communication, Defendant Russell instructed hospital staff that Plaintiff could not visit A.T. and stated that the mother of the baby ("MOB") was "not the most sober person right now." Defendant Russell was not present at Plaintiff's residence and made that statement without personal observation of Plaintiff.

93. Hospital staff recorded as late as 5:06 p.m. on September 8, 2022 that hold paperwork had not been received. The hold paperwork was eventually faxed to the hospital on September 9, 2022.

94. Beginning on September 7, 2022, when Defendant Russell first told hospital staff that Plaintiff could not visit A.T., and throughout the period described in paragraphs 91 through 93, Plaintiff was barred from seeing her child in the NICU. No court order and no executed peace officer hold authorized that bar when Defendant Russell imposed it. The bar was still in place on September 11, 2022 (paragraph 95), and Plaintiff did not see A.T. again until September 22, 2022.

95. On September 11, 2022, A.T.'s treating neonatologist, Dr. Fahim, told Plaintiff by telephone that she could come to the hospital and visit A.T. Plaintiff set out for the hospital. While she was on her way, a hospital social worker telephoned Plaintiff and told her that, per Washington County social workers, she could not visit A.T. at that time. The social worker's

note records that the hold suspended Plaintiff's visitation rights and that a sticky note in the chart stated that "parental visits would be suspended until after baby discharges." Plaintiff was not permitted to visit A.T.

**G. Defendants Had the Opportunity to Seek a Court Order**

96. September 6, 7, 8, 9, and 12, 2022 were a Tuesday, a Wednesday, a Thursday, a Friday, and a Monday. The Washington County District Court was open for business on those days.

97. As of September 8, 2022, Minnesota law provided that a court could order a child taken into immediate custody on the basis of a notarized petition or sworn affidavit, upon individualized and explicit findings that reasonable grounds existed to believe that the child was in surroundings or conditions that endangered the child's health, safety, or welfare and that continuation of the child in the parent's custody was contrary to the child's welfare. Minn. Stat. § 260C.151, subd. 6.

98. Defendant Russell began planning a foster-care placement for A.T. no later than September 6, 2022, and by September 7, 2022 had "started the paperwork for placement of baby in foster care."

99. The hospital's social work note for September 2, 2022 records that at 1:46 p.m. a hospital social worker reported a toxicology result concerning A.T. to Washington County child protection, that "[a]ppropriate documents were faxed over to Washington County for additional review," and that A.T. "has not been placed on a hold at this time." Upon information and belief, no court order concerning any of Plaintiff's children existed during the six days between that report and the removal on September 8, 2022. On September 9, 2022, at 12:49 p.m., Defendant Russell emailed the hospital social worker asking that A.T.'s toxicology screen results be faxed

to her. Plaintiff alleges the second sentence of this paragraph upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

100. The same note records that the hospital social worker informed the County intake worker that Plaintiff was in surgery or recovery and had not yet been told of the report, and that the hospital would discuss the report with the parents the following day. Upon information and belief, that information reached Defendant Russell, whom the CHIPS petition states was assigned to conduct the family assessment on September 2, 2022. Plaintiff alleges the facts in the second sentence of this paragraph upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

101. The form lists the time Plaintiff's children were taken into custody as 11:25 a.m. on Thursday, September 8, 2022. Under Minnesota law, a child placed in a relative's home or shelter care by a peace officer under Minn. Stat. § 260C.175, subd. 1 may not be held in custody longer than 72 hours, excluding Saturdays, Sundays, and holidays, unless a petition has been filed and a judge or referee determines under § 260C.178 that the child shall remain in custody. Minn. Stat. § 260C.176, subd. 2(b). On September 13, 2022, at 8:14 a.m., Defendant Russell told Plaintiff by email that "[c]ourt will be today at 1pm."

**H. Discrepancies Between Contemporaneous Records and Subsequent Court Filings**

102. On September 13, 2022, Defendant Russell filed a CHIPS petition in Washington County District Court. The petition stated that "[w]hen officers arrived at the home, they reported to SW Kekulah that they have dealt with [associate] in the past, that he is dangerous, and that he can be volatile."

103. The contemporaneous CAD records do not reflect officers independently providing those characterizations to Defendant Kekulah prior to the removal.

104. The CAD reports attribute the description of [Associate] as "volatile" to Defendant Kekulah.

105. The CHIPS petition did not reference the officers' refusals to place an emergency hold, the Kwik Trip meeting where Defendant Kekulah documented that she "did not have anything legally stopping" Plaintiff from retaining custody, or the fact that Defendant Kekulah contemporaneously recorded that Plaintiff "can come and take those kids at any time."

106. The CHIPS petition characterized Plaintiff as appearing "very thin and small for an adult her age."

107. At the time of the alleged observation, Plaintiff was less than two weeks postpartum following the birth of her daughter.

108. The petition did not reference that Plaintiff was recovering from multiple emergency surgical procedures.

109. At a post-operative visit on September 9, 2022, the day after the removal, Plaintiff's provider documented on examination that she was "[h]ealthy, alert and no distress"; that her "[m]entation and speech [were] appropriate for age"; and that her "[m]entation appears normal, affect normal/bright, judgement and insight intact, normal speech and appearance well-groomed."

110. The petition did not state Plaintiff had been denied an opportunity to consult counsel, or that Plaintiff had requested Defendant Kekulah leave the residence on three separate occasions.

111. The CHIPS petition did not reference Dr. Fahim's September 11, 2022 progress note, in which she documented that Plaintiff had been "very appropriate, affectionate and caring"

and described the measures preventing mother and child from bonding as "unusual, extreme and unwarranted" (paragraph 138).

112. The petition stated that A.T. "was still in the Neonatal Intensive Care Unit (hereinafter NICU) after displaying symptoms of withdrawal and respiratory distress at delivery at 35 weeks." Dr. Fahim's records and testimony reflect no clinical signs of neonatal withdrawal and that A.T. was admitted to the NICU because of her premature birth (paragraph 139). The petition did not state that the hospital's records, including A.T.'s discharge paperwork dated September 12, 2022, noted Plaintiff's prescription for Adderall for adult ADHD, that she received Dilaudid before delivery, or that other medications can present with methamphetamine metabolites.

113. The petition stated that Defendant Russell left Plaintiff a voicemail on September 2, 2022, that she "again attempted to contact Ms. Larson on September 6, 2022, without success, and also went to the residence but it appeared that no one was home," and that on September 7, 2022 she left another voicemail and went to the home, where "no one answered the door." The petition did not state that, on September 2, 2022, the hospital had told County intake that Plaintiff was in surgery or recovery (paragraph 100).

114. In gathering information for, drafting, and submitting the CHIPS Petition, Defendants Russell and Kekulah did not include Defendant Russell's own in-person visit with Plaintiff in Hospital Room 216 on or about September 5, 2022, or Plaintiff's September 7, 2022 email to Defendant Russell confirming her discharge and her availability to meet. Defendant Kekulah's September 8, 2022 written statement to Defendant Koethe mentioned neither, and stated that County staff "have been trying to get a hold of Brittani and have been unable" (paragraph 79).

115. On September 13, 2022, Defendant Russell also signed a Report to Court in the same proceeding (Court File No. 82-JV-22-413), dated September 9, 2022, certifying that its content "is true and correct and is based upon personal observation, first-hand knowledge, or information and belief." The Report to Court describes the same events as the CHIPS petition, but the two differ from each other, and from other records, in the respects alleged in paragraphs 116 through 119.

116. The petition stated that hospital staff "shared concerns for their behaviors while there, including erratic and odd behavior by Ms. Larson and an instance where Ms. Larson left the NICU for two (2) hours during a visit and could not be located." Describing the same September 7, 2022 hospital contact, the Report to Court states: "The nurse reported that Ms. Larson had been appropriate while visiting [A.T.] and there were concerns regarding Mr. Larson's behavior," and "The nurse reported that Ms. Larson was appropriate when visiting baby." The Report to Court attributes the nurse's concerns to a "Mr. Larson," not to Plaintiff, and does not mention erratic behavior by Plaintiff or a two-hour absence from the NICU.

117. The Report to Court states that Defendant Russell "received a voice mail from Ms. Larson on 9/7/2022" and that "Ms. Larson sent the worker an email later that night." The petition mentions neither the voicemail nor the email (paragraphs 113 and 114).

118. Plaintiff's call history reflects no call from Defendant Russell on September 9, 2022, although the Report to Court states that she "attempted to contact Ms. Larson on 9/9/2022" and her September 12, 2022 email to Plaintiff states, "I did call you on 9/9/22 but was unable to leave a voicemail for you. I have not heard from you until today." Plaintiff had emailed Defendant Russell at 9:02 PM on September 7, 2022 (paragraph 31), and the Report to Court acknowledges that email (paragraph 117).

119. The Report to Court lists “Date first placed out-of-home: 9/8/2022” and leaves the field “Date court ordered out-of-home” blank.

120. The CHIPS petition attributes statements and conduct to Plaintiff’s mother, to the adult associate, and to Plaintiff, including that Plaintiff “screamed at officers and SW Kekulah.” Plaintiff did not scream at officers or at Defendant Kekulah, and the Report to Court does not say that she did. Plaintiff does not adopt the petition’s accounts of the statements and conduct of others. The associate had left the residence before Officer Koethe arrived (paragraph 44), law enforcement left Plaintiff inside the residence (paragraph 43), and Defendant Kekulah recorded that Plaintiff “can come and take those kids at any time” (paragraph 49).

121. Plaintiff alleges that these omissions and differences bear on the accuracy and completeness of the information Defendants gave the court, independent of the state court’s subsequent adjudication.

**I. Record-Keeping and MGDPA Responses**

122. On November 24, 2023, Plaintiff submitted a written records request to the Oakdale Police Department via electronic mail, explicitly stating: “Hello, I am looking to receive all reports available from 9/8/22 of an incident of responding law enforcement to my home address of [Plaintiff’s residence address]. Additionally, on the same day, Oakdale PD did a 72 hour emergency hold on my children at a local hotel. I would like all information available. How do I go about receiving these reports? Thanks in advance! Best, Brittani Larson”

123. In response to this direct 11/24/23 request, on November 29, 2023, Oakdale Police Department records personnel did not transmit the underlying emergency hold instruments, transmitting only an initial officer CAD summary report stating that law enforcement “stood by” while county workers took custody.

124. In June 2026, Plaintiff initiated a formal public records request under the Minnesota Government Data Practices Act (MGDPA). The Oakdale Police Department partially fulfilled this request in July 2026, releasing the CAD notes and the underlying physical hold paperwork, while noting that the remainder of Plaintiff's requests would be forwarded to the Chief of Police.

125. Plaintiff did not receive or gain access to the underlying 72-hour hold forms until this July 2026 MGDPA production was completed. Upon receiving the paperwork, Plaintiff discovered that her children had been processed under an inapplicable delinquency statute (Chapter 260B) and that, in the copy produced to her, the form's handwritten reasons read "drug use" and "current drug use."

126. Defendants did not provide these mandatory administrative instruments in response to Plaintiff's November 2023 records request or during the active state court proceedings.

127. On July 6, 2026, the Oakdale Police Department informed Plaintiff in writing that no digital media (video, photographs, and similar) is available for Incident Nos. OD22011460 or OD22011466 because digital media for this case type is purged after one year. Plaintiff has not been provided complete dispatch records, call logs, inter-agency communications between the Department and Washington County Community Services, records or emails involving Detective Kim Coffey regarding the authorization of the hold, supplemental investigative reports, internal memoranda, administrative after-action reviews, dispatch audio, internal emails, or dispatch code definitions concerning the September 8, 2022 incident and as requested in 2026 MGDPA request.

**J. Subsequent Events and Contradictory Medical Records**

128. The petition and the Report to Court describe attempts to reach Plaintiff by telephone and at her home on September 2, 6, and 7, 2022. On September 2, 2022, Plaintiff was an inpatient in surgery or recovery (paragraph 100), and she was discharged on the afternoon of September 6, 2022, as she wrote to Defendant Russell on September 7 (paragraph 31). The petition does not state that Plaintiff was hospitalized on September 2 or had just been discharged on September 6. The Report to Court states that a nurse told Defendant Russell on September 7 that Plaintiff "had been discharged from the hospital that day"; Plaintiff's own email that night states that she was discharged "yesterday afternoon." Neither document states that law enforcement twice declined to place an emergency hold on the children.

129. On September 12, 2022, Plaintiff sent a written electronic communication to Defendant Russell stating: "I'm unsure why communication stopped once my children were abruptly taken from me? I'm also not sure why reasonable services weren't offered to me? There is no reason my children were unable to stay at home. If the problem is [associate], then he leaves. Not my children. He doesn't live at my home, he has no key of entry. Contrary what others believe at this point, he is far from perfect but he's not violent and not a threat to my children, or household."

130. While attempting to maintain contact with the agency regarding her children, Plaintiff sent a written electronic communication to Defendant Russell on September 13, 2022, asking "when can I see them? How does this work?"

131. On the afternoon of September 13, 2022, Plaintiff wrote to Defendant Russell that she was "unsure why I was left out of this critical decision making in regards to my children." Defendant Russell's reply did not answer that question; it stated that a kinship worker was contacting relatives and that Plaintiff could "send information regarding relatives."

132. At 4:22 p.m. on September 13, 2022, Defendant Russell wrote to Plaintiff that A.T.'s foster parent "will contact you and provide updates" and that a new worker would provide the details so Plaintiff could attend A.T.'s appointments. The message did not tell Plaintiff where A.T. had been placed.

133. On September 12, 2022, Defendant Russell issued a formal "To Whom It May Concern" letter on Washington County letterhead. The letter stated that the foster parent was "authorized by court order" to provide for and sign medical authorizations for R.T. The letter also states that the parents of R.T., only have court ordered supervised contact and cannot transport R.T. independently.

134. Upon information and belief, no such court order had yet been entered; the Emergency Protective Care hearing occurred the following day, September 13, 2022. Plaintiff alleges the first clause of the preceding sentence upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

135. Also on September 12, 2022, Defendant Russell dated a form letter titled "CPS Notice of Assessment Summary," which was mailed to Plaintiff. The letter states, among other things: "We talked about your child(ren)'s safety and if your family could benefit from services with our agency or a community agency"; "The decision made with your family was that protective services/family support services are needed. A family service case will be opened within the Washington County Community Services"; and "I appreciate you allowing me to talk with you about your family." Plaintiff did not agree to services, and her children were then being held under a 72-hour hold.

136. Defendant Russell did not conduct the September 8 home visit. Her only in-person contact with Plaintiff before the removal was a visit in Plaintiff's hospital room on or about September 5, 2022 (paragraph 25).

137. The infant's treating neonatologist, Dr. Nancy Magdy Adly Fahim, documented in the certified medical charts the medications prescribed to Plaintiff and the medications administered to her in the hospital.

138. In a progress note dated September 11, 2022, Dr. Fahim documented that Plaintiff had been "very appropriate, affectionate and caring" and described the measures preventing mother and child from bonding as "unusual, extreme and unwarranted." Dr. Fahim subsequently testified to these factual observations at an evidentiary hearing.

139. Dr. Fahim's medical records and her sworn testimony at the September 19, 2022 evidentiary hearing reflect that A.T. exhibited no clinical signs of neonatal withdrawal. The same medical records reflect that A.T. was admitted to the NICU because of her premature birth.

**K. Administrative Notice and Document Maintenance History**

140. Throughout the child protection proceedings, Plaintiff made documented efforts to correct factual inaccuracies and material omissions in County records and reports. Between September 2022 and August 2024, she sent written communications to her legal counsel, Guardian ad Litem Nancy Cottrell, and social work personnel, including Jane Lindstrom and Kathryn Bursinger, identifying specific discrepancies. These included misidentification of the intake worker involved in the removal; omissions concerning toxicology results and Plaintiff's efforts to address the County's stated concerns; and inaccurate or incomplete medical explanations for the infant's hospitalization that Plaintiff contends conflicted with information documented or clarified by the treating neonatologist.

141. Plaintiff's communications placed the recipients on notice of the identified discrepancies. Nevertheless, she alleges that County personnel continued to include or repeat disputed information in subsequent reports and case plans without adequately correcting or resolving the identified inaccuracies and omissions. Plaintiff's records reflect both the communications identifying the discrepancies and the subsequent reports containing the challenged information.

142. On March 28, 2023, Plaintiff sent an email to Washington County Community Services Division Director Sarah Amundson, copying Plaintiff's attorney and forwarding to caseworker, Kathryn Bursinger, thereby placing the agency on notice of Plaintiff's complaints. The email stated that Plaintiff believed events at the beginning of her case were illegal and violated her constitutional rights. It described, among other things, that Defendant Kekulah did not show identification, refused three requests to leave Plaintiff's home, told Plaintiff that she would take the children if Plaintiff and the associate did not take a drug test, and did not allow Plaintiff time to consult an attorney; that Plaintiff's visitation with her newborn in the NICU was suspended on September 7, 2022; and that the CHIPS petition contained inaccuracies.

143. The email notification further alerted Director Amundson to a conflict of interest, noting that Defendant Kekulah—the individual who executed the physical removal—was then the supervisor of Plaintiff's case worker, Kathryn Bursinger. Director Amundson did not respond or alter Defendant Kekulah's supervisory assignment over the file.

144. Washington County social workers altered family communication access by instructing placement providers to limit contact. Specifically, on September 12, 2022, the designated family placement caregiver for minor child R.T. communicated in writing to Plaintiff:

"I just didn't respond because they told me I couldn't but that changed today," documenting direct interference with Plaintiff's parent-child relationship by Washington County personnel.

**L. The Separation and Dispersal of the Minor Children**

145. Between September 10 and September 12, 2022, before the first court hearing on September 13, 2022, Washington County personnel placed the three minor children in three separate homes across three separate municipal zip codes.

146. Due to the geographic dispersal and administrative placement directives maintained by the county, Plaintiff had no physical contact with minor child J.L. for a consecutive period of 31 days following the initial removal. Plaintiff was entirely separated from physical contact with minor child R.T. for 15 days, and minor child A.T. for 16 days.

147. Plaintiff did not regain full custody of J.L. and A.T. until December 2023. R.T. remained in an alternative placement until August 2024, when custody of R.T. was transferred by voluntary transfer. Under the resulting court-ordered parenting agreement, Plaintiff has R.T. every weekend and on holidays, and is to be included in decisions about R.T.'s medical care, education, and similar matters.

**M. The State Proceedings and Matters Within Defendants' Possession**

148. In October 2022, more than five weeks after the September 8, 2022 events alleged in this Amended Complaint, Plaintiff, represented by counsel, admitted that her children were in need of protection or services within the meaning of Minn. Stat. § 260C.007, subd. 6(8), and the state court entered an order adjudicating the children in need of protection or services. That admission and adjudication postdated the conduct alleged in this Amended Complaint. They were not known to, and were not the basis for, any Defendant's actions on September 6, 7, or 8, 2022.

149. The state child protection proceedings have concluded with the entry of final orders. Plaintiff does not seek to overturn, modify, or otherwise challenge those orders in this action. Plaintiff seeks solely retrospective monetary damages for the independent constitutional violations alleged herein.

150. Certain allegations in this Amended Complaint are made upon information and belief because the facts are peculiarly within Defendants' possession, including Washington County dispatch audio, the meaning of dispatch codes used by the Oakdale Police Department, internal communications of both entities, and, to the extent they were retained, squad GPS/AVL records. Plaintiff does not possess those records. Pursuant to Fed. R. Civ. P. 11(b)(3), Plaintiff specifically identifies each allegation made upon information and belief as one that will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

151. Plaintiff has made three requests to Washington County for her complete child-protection file. The County has not produced the social workers' case notes or SSIS entries for September 2, 2022 (when the County was informed of a toxicology result and Defendant Russell was assigned to the family assessment) through September 19, 2022 (the day before Plaintiff was transferred to an ongoing worker). Apart from the Investigation/Family Assessment Summary, Plaintiff has received few of the records created by Defendants Russell and Kekulah. Those records are in the County's exclusive possession. Plaintiff pleads on information and belief only the specific allegations identified as such in this Amended Complaint.

## V. CAUSES OF ACTION

152. Plaintiff's claims arise under the Fourteenth Amendment and 42 U.S.C. § 1983. She does not allege that a violation of Minnesota law is by itself actionable under § 1983. She alleges the requirements of Minn. Stat. §§ 260C.151, 260C.175, and 260C.176 because they

define the authority and process Minnesota provides for taking a child from a parent in an emergency, and because Defendants' lack of that authority and process bears on whether they had reasonable suspicion of imminent danger and on what notice and process Plaintiff received.

**COUNT I**

**42 U.S.C. § 1983 – Deprivation of Parental Liberty Interest and Familial Integrity (In Violation of the Fourteenth Amendment Substantive Due Process Clause) (Against Defendants Kekulah, Koethe, Coffey, Galvin, and Russell in their individual capacities)**

153. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

154. Plaintiff Brittani Larson possesses a clearly established fundamental liberty interest protected by the substantive Due Process Clause of the Fourteenth Amendment in the care, custody, companionship, and management of her minor children. See *Swipies v. Kofka*, 348 F.3d 701, 703-04 (8th Cir. 2003) ("Parents have a liberty interest in the care, custody, and management of their children.").

155. As stated in paragraph 2, Plaintiff asserts only her own constitutional claims and none belonging to her minor children.

**A. Defendant Kekulah**

156. On September 8, 2022, Defendant Kekulah, acting under color of state law, took Plaintiff's eighteen-month-old daughter, R.T., from Plaintiff's home without a warrant, without a court order, and without a peace officer's hold. She did it after Officer Koethe refused her request for an emergency hold (paragraph 42). She did it after law enforcement left Plaintiff inside the residence (paragraph 43). She did it after the adult associate had already gone, before any officer arrived (paragraph 44). Then she drove to a Kwik Trip, asked an officer again for a hold, and was refused a second time (paragraph 48). She wrote in her own record that she "did

not have anything legally stopping" Plaintiff and that Plaintiff "can come and take those kids at any time" (paragraph 49). She kept R.T. anyway. Defendant Kekulah lacked reasonable suspicion of abuse or imminent danger, and her seizure of R.T. unconstitutionally interfered with Plaintiff's protected liberty interest in maintaining the integrity of her family unit.

157. The officers on scene refused twice (paragraphs 42 and 48). Defendant Kekulah went around them. She contacted Defendant Coffey, who was not at Plaintiff's residence (paragraph 74), and her own case notes record that she "was able to get" the hold placed (paragraphs 71 and 72).

**B. Defendant Koethe**

158. Defendant Koethe, acting under color of state law, responded to Plaintiff's residence at 11:43:58 a.m. on September 8, 2022 and declined Defendant Kekulah's request for a hold. Defendant Koethe was present when Defendant Kekulah took R.T. from Plaintiff's home, and he rushed Plaintiff as she packed R.T.'s bag, telling her he did not have all day and that there was no time to wash bottles.

159. On September 8, 2022, at the hotel, Defendant Koethe signed a 72-hour hold form that (a) gave as its reasons, in the copy produced to Plaintiff, the handwritten words "drug use" and "current drug use" without any supporting fact, (b) cited a juvenile delinquency statute rather than the child protection statutes, and (c) listed 11:25 a.m. as the time the children were taken into custody, before he arrived at Plaintiff's residence (paragraph 81).

160. Defendant Koethe signed the form after he himself had declined to authorize a hold. The form stated no supporting fact. Its own instructions list "Crisis Response has not been called on 72 Hour holds" among the circumstances in which not to place a child on a 72-hour hold. He signed it after taking a written statement from Defendant Kekulah that cited no test

result and said only that the parents were “believed to be” actively using methamphetamine. By signing, he gave Defendant Kekulah’s custody of R.T., and the custody of Plaintiff’s other children, the appearance of legal authority. Defendant Koethe’s conduct was arbitrary, was unrelated to any legitimate child-protection objective, and shocks the conscience.

**C. Defendant Coffey**

161. Defendant Coffey, acting under color of state law, directed Defendant Koethe to meet Defendant Kekulah and execute the 72-hour hold paperwork. She gave that direction after on-scene officers had twice declined Defendant Kekulah’s requests for a hold, without having been present at Plaintiff’s residence, and without speaking with Plaintiff. Upon information and belief, she gave it without speaking with any of the children or independently investigating whether an emergency existed.

162. Defendant Coffey’s direction caused the hold form to be executed and gave Defendant Kekulah’s custody of Plaintiff’s children the appearance of legal authority. Defendant Coffey is personally responsible for the resulting seizure of Plaintiff’s children, which was not supported by reasonable suspicion of abuse or imminent danger and which shocks the conscience. The sequence was this. Officer Koethe declined Defendant Kekulah’s request for a hold at Plaintiff’s home (paragraph 42). An officer declined it again at the Kwik Trip (paragraph 48). Defendant Kekulah then went to Defendant Coffey, who was not at the scene (paragraphs 71 and 74), and the hold was signed hours later (paragraph 77). The Oakdale Police Department’s own account, as quoted in paragraph 73, identifies one change: the officer was “educated” about the lengths Social Services goes to in its investigations. It identifies no new fact about danger to any child.

**D. Defendant Galvin**

163. On September 8, 2022, Defendant Galvin, acting under color of state law and in coordination with Washington County Community Services personnel who had planned J.L.'s removal from school that day, removed Plaintiff's minor child J.L. from school grounds and surrendered him to a relative who was not an authorized contact (paragraph 62) without a warrant, court order, or Plaintiff's consent, further depriving Plaintiff of her parental liberty interest and right to direct the upbringing and welfare of her child.

**E. Defendant Russell**

164. Defendant Russell, acting under color of state law, directed hospital staff on September 7 and 8, 2022 to suspend Plaintiff's visits with her newborn daughter, A.T., a patient in the hospital's Neonatal Intensive Care Unit, stating that A.T. was "NOT able to stay with MOB" and that a hold was "in process." No court order existed, and no hold had been executed, when she gave those directions.

165. Defendant Russell gave those directions while Plaintiff was recovering at home from emergency surgery, which Defendant Russell knew from her in-person visit to Plaintiff's hospital room on or about September 5, 2022. On September 8, 2022, Defendant Russell, who was not present at Plaintiff's residence and did not personally observe Plaintiff, told hospital staff that Plaintiff was "not the most sober person right now." That statement caused hospital staff to bar Plaintiff from A.T.

166. Defendant Russell's directions were not a response to any emergency. The first of them preceded the September 8, 2022 home visit, all of them were issued without a court order or an executed hold, and they kept a mother from her premature newborn. A.T.'s treating neonatologist documented on September 11, 2022 that the measures preventing mother and child

from bonding were "unusual, extreme and unwarranted" (paragraph 138). Defendant Russell's conduct was arbitrary, was unrelated to any legitimate child-protection objective, and shocks the conscience, and it deprived Plaintiff of her fundamental liberty interest in the care and companionship of A.T.

167. Plaintiff pleads the allegations against Defendant Russell in this Count in addition to, and in the alternative to, Count II. Fed. R. Civ. P. 8(d)(2)–(3).

**F. Allegations Common to Count I**

168. At all relevant times, no exigent circumstances justified the immediate seizure and separation of Plaintiff's children from her care. The facts alleged in paragraphs 42 through 49 show that no reasonable suspicion of abuse or imminent danger existed to justify the removal without a court order. See *Swipies*, 348 F.3d at 703-04.

169. Dispatch recorded the responding units as "C4" sixty-nine seconds after Defendant Koethe arrived (paragraphs 53 and 54). Six days passed between the hospital's September 2, 2022 report to the County and the removal, and, as alleged on information and belief in paragraph 99, no court order concerning any of Plaintiff's children existed during that period. September 6, 7, 8, 9, and 12, 2022 were weekdays on which Defendants could have applied to a court for an order. No emergency prevented Defendants from doing so.

170. The emergency hold form subsequently executed at the hotel listed a custody time of 11:25 a.m., about four hours before it was signed and before any officer had arrived at Plaintiff's residence, cited an inapplicable juvenile delinquency statute (Chapter 260B), and contained no articulable facts supporting reasonable suspicion or imminent danger.

171. As a direct and proximate result of Defendants' unconstitutional interference with Plaintiff's parental liberty interest, Plaintiff has suffered severe emotional distress, mental

anguish, trauma, loss of familial association, and the destruction of her parent-child bond. These injuries are personal to Plaintiff and are not derivative of any claim belonging to her children.

172. Plaintiff first received the hold form in July 2026 (paragraph 125). Learning then that her children had been processed under a juvenile delinquency statute on the strength of the words "drug use" and "current drug use" caused Plaintiff additional emotional distress.

## COUNT II

### 42 U.S.C. § 1983 – Deprivation of Procedural Due Process and Familial Interference (In Violation of the Fourteenth Amendment Procedural Due Process Clause) (Against Defendants Russell and Kekulah in their individual capacities)

173. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

174. Plaintiff Brittani Larson possesses a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment in the care, custody, and management of her minor children.

175. Defendants Russell and Kekulah acted under color of state law at all times relevant to this Count.

176. When R.T. was taken from Plaintiff's home, and when Plaintiff was barred from visiting A.T. at the hospital, no warrant, court order, or executed peace officer hold existed. Plaintiff received no prior notice that R.T. would be taken, that J.L. would be removed from his school bus, or that her access to A.T. would be suspended, and Plaintiff had no opportunity to be heard before or at the time of those deprivations. Plaintiff was not told where J.L. was and nearly reported him missing to the police. See paragraph 68. On September 7, 2022, hospital NICU staff, not the County, told Plaintiff that child protection had suspended her visits. On September

11, 2022, while Plaintiff was on her way to the hospital, a hospital social worker told her that, per Washington County social workers, she could not visit A.T. (paragraph 95).

177. The Fourteenth Amendment required that Plaintiff receive notice and an opportunity to be heard before Defendants separated her from her children and barred her from her newborn, unless a genuine emergency made that impossible. No emergency existed (paragraphs 168 and 169), and the hospital had reported A.T.'s toxicology result to the County six days before the removal (paragraph 99).

178. The process that followed was not meaningful. On the morning of September 12, 2022, counting the days, Plaintiff emailed Defendant Russell for the Zoom information for the hearing she expected on September 13, 2022. Defendant Russell answered that she did not have it and that "Next Steps will be discussed at court." That afternoon, Plaintiff wrote to Defendant Russell that she had been "in touch with Washington County all afternoon trying to figure out tomorrow's hearing time," that "[t]hey have tried everything but unable to find it," and asked whether Defendant Russell had a court case number. At 8:14 a.m. on September 13, 2022, less than five hours before the hearing, Defendant Russell told Plaintiff by email that "[c]ourt will be today at 1pm" (paragraph 101). Plaintiff had no attorney until one was appointed during the hearing, which was held virtually, and she and the attorney had about five minutes together in a breakout room. The hearing was continued because one of the children's fathers did not yet have an attorney. The next hearing, at which testimony was taken, was held on Monday, September 19, 2022 (paragraph 139), eleven days after the removal. Plaintiff did not see A.T. again until September 22, 2022 (paragraph 94). Plaintiff alleges these facts to show the process Defendants' actions left her, and not to challenge any ruling of the state court.

**A. Defendant Russell**

179. On September 7 and 8, 2022, Defendant Russell issued directives to hospital staff suspending Plaintiff's visits with A.T., declaring that A.T. was "NOT able to stay with MOB," and stating that a hold was "in process," before any hold had been executed and without any court order.

180. On September 8, 2022, Defendant Russell told hospital staff that the mother of the baby was "not the most sober person right now," without personal observation of Plaintiff (paragraph 92), although she knew from her September 5, 2022 visit to Plaintiff's hospital room and from Plaintiff's September 7, 2022 email that Plaintiff was recovering from surgery, reachable, and available to meet. Defendant Russell's statements caused hospital staff to bar Plaintiff from A.T.

181. On September 12, 2022, Defendant Russell issued a letter on Washington County letterhead representing to third parties that a foster parent was "authorized by court order" to sign medical authorizations for R.T. The letter further stated that Plaintiff and R.T.'s father "are court ordered to have only supervised contact with" R.T. and that "they are not currently authorized to pick [R.T.] up from appointments, daycare or transport her independently." Upon information and belief, no such order had been entered; the Emergency Protective Care hearing did not occur until September 13, 2022. Plaintiff alleges the first clause of the preceding sentence upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), as set out in Part IV.M below.

182. Through these acts, Defendant Russell deprived Plaintiff of her liberty interest in the care and companionship of A.T. and R.T. without notice, without any court order or executed hold, and without any opportunity to be heard. The hearing was set for 1:00 p.m. on September 13, 2022. On September 12, 2022, Defendant Russell also dated a "CPS Notice of Assessment Summary" stating that a decision had been made with Plaintiff's family that protective services

were needed and that a family service case would be opened (paragraph 135). Plaintiff did not agree to services.

**B. Defendant Kekulah**

183. On September 8, 2022, Defendant Kekulah, acting under color of state law, took physical custody of R.T. without Plaintiff's consent, after denying Plaintiff's request to consult counsel and after refusing three requests to leave Plaintiff's home, and without a warrant, court order, or executed hold.

184. Defendant Kekulah did not show or serve Plaintiff with any hold paperwork. Plaintiff did not see the 72-hour hold form later executed at the hotel until July 2026 (paragraph 125). Plaintiff therefore was not told, at the time, the grounds on which her children were being held, and she did not have the form during the state court proceedings.

**C. Allegations Common to Count II**

185. Defendants Russell and Kekulah further interfered with Plaintiff's procedural protections and right to familial association by directing placement caregivers not to communicate with Plaintiff and by effectuating the long-term geographical separation and dispersal of the children across distant zip codes, thereby isolating her from her children and support network. A.T.'s hospital discharge paperwork dated September 12, 2022 records that child protective services "placed a hold on this infant without allowing maternal visitation or bonding of infant throughout the latter part of her stay" and had arranged foster placement. A.T. was discharged to that placement on September 12, 2022. No Defendant told Plaintiff where A.T. had been placed. Plaintiff learned where A.T. was when the foster parent contacted her on or about September 19, 2022, and first saw A.T. on September 22, 2022.

186. As a direct and proximate result of Defendants' procedural failures and continuing course of conduct, Plaintiff was separated from her children, causing severe emotional, psychological, and physical family trauma.

**COUNT III**

**42 U.S.C. § 1983 – Monell Municipal Liability for Defective Training, Customs, and Policies (Against Defendants Washington County, City of Oakdale, and ISD 622)**

187. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

188. The constitutional injuries inflicted upon Plaintiff were the result of policies, administrative customs, practices, and failures to train maintained by Washington County, the City of Oakdale, and Independent School District 622.

**A. Defendant Washington County**

189. Upon information and belief, Washington County, through Washington County Community Services, produced, printed, and distributed the form designated "WCCS-71040-8 (4-09) 4p," which was used to document the 72-hour hold of Plaintiff's children on September 8, 2022. The form carries a "Note to Law Enforcement Officers" stating that it "does not take the place of a report to be forwarded to Washington County Community Services, Social Service Child Intake," and a distribution legend that routes the original to Community Services and copies to "Shelter," "District Court, Juvenile Division," and "Law Enforcement." Upon information and belief, Washington County Community Services distributed the form to law enforcement agencies in Washington County, including the Oakdale Police Department, for use in documenting emergency holds of children in child-protection matters.

190. The form cites Minn. Stat. § 260B.175, subdivisions 1 and 3, which govern the taking of children into custody in juvenile delinquency matters, rather than Minn. Stat. §§

260C.175 and 260C.176, which govern emergency custody in child-protection matters. Upon information and belief, the form had been in use in substantially the same version since approximately April 2009, a period of more than thirteen years, and was used in other child-protection holds during that period.

191. Upon information and belief, it was Washington County's custom for child-protection workers to instruct hospital staff to suspend a parent's visitation with a hospitalized newborn before obtaining a court order or an executed peace officer hold, as Defendant Russell did here on September 7 and 8, 2022. Plaintiff alleges the facts in the second sentence of the preceding paragraph and in this paragraph upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), because the records of other families' cases are in Washington County's possession.

192. Defendant Washington County maintains an administrative custom, policy, and practice of deliberate indifference by ratifying warrantless, extrajudicial police removals, assigning a primary intake worker to a supervisory capacity over an active case file in which she was a participant, and causing prolonged geographic sibling separations. Washington County's deliberate indifference to Plaintiff's constitutional rights is further evidenced by its failure to investigate or remediate the violations after receiving formal notice from Plaintiff on March 28, 2023.

193. Washington County's use of a form that cites the wrong statute, which upon information and belief it kept in use for more than thirteen years, was a moving force behind the injuries described in paragraphs 198 through 202. Upon information and belief, Washington County's child-protection workers also had a practice of obtaining peace officer holds, and of directing hospital staff to suspend a parent's visitation (paragraph 191), instead of first seeking court orders, and that practice was a moving force behind the removal of Plaintiff's children and

the suspension of her visits with A.T. Plaintiff alleges this practice upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), because the records of other families' cases are in Washington County's possession. The facts supporting that belief include the form itself (paragraphs 189 and 190), Captain Goodwin's statement that when a hold was not signed, Social Services reached out to an investigation division "who work with them more routinely" (paragraph 73), and the six days between the County's receipt of the hospital's September 2, 2022 report and the removal, during which no court order was obtained (paragraphs 96 through 99).

**B. Defendant City of Oakdale**

194. Defendant City of Oakdale maintains a training protocol and custom regarding the statutory boundaries of 72-hour peace officer holds. In a November 20, 2023 email, Oakdale Police Captain Steve Goodwin wrote that the "confusion was simply a matter of education on the officers part," that at the time "there was some questions with transport and court ordered holds," and that the Department tries "to learn from shortcomings." Plaintiff alleges that this lack of training led to the use of incorrect juvenile delinquency statutes and forms factually devoid of the justifications required by law to execute warrantless seizures of non-delinquent minors. The deficiency was further maintained by record-keeping customs that resulted in the withholding of the hold forms during Plaintiff's initial 2023 records requests. The City's failure to adequately train officers on the constitutional limits of child removal and the proper statutory authority for emergency holds was a moving force behind the constitutional injury to Plaintiff.

195. Upon information and belief, it was the custom of the Oakdale Police Department to execute child-protection holds at the request of county social workers, or at the direction of a detective who had not been to the scene, without independently evaluating whether the facts

supported reasonable suspicion of abuse or imminent danger, as occurred here when Defendant Koethe signed a hold form hours after declining to authorize one. Plaintiff alleges this custom upon information and belief pursuant to Fed. R. Civ. P. 11(b)(3), because records of other holds are in the City's possession. The facts supporting that belief include Captain Goodwin's November 20, 2023 statements quoted in paragraphs 73 and 194. In particular, Captain Goodwin wrote that when the hold was not signed, Social Services "reached out to our investigation division, who work with them more routinely," which describes the investigation division as the unit Social Services turns to when a hold has not been signed.

196. The need to train officers on the constitutional limits of emergency child seizures, on stating the factual basis for a hold, and on the difference between Chapter 260B and Chapter 260C was obvious. Officers who respond to child-protection calls will predictably be asked to authorize or document seizures of children. The City's training failures amounted to deliberate indifference to the rights of parents such as Plaintiff.

**C. Defendant Independent School District 622**

197. Defendant ISD 622 maintains an unconstitutional practice and failure to train that permits school administrators to remove and surrender student minors from transit vehicles and school grounds to external state actors without requiring verification of a warrant, court order, or valid child welfare emergency documentation. The risk that an unauthorized adult could remove a student from school grounds without proper authorization is a highly predictable consequence of failing to train administrators on student-release protocols. The District's protocol, as Defendant Galvin described it (paragraph 64), requires ID verification and authorized status in the student system, yet the District failed to ensure compliance with that protocol, resulting in the unconstitutional deprivation of Plaintiff's parental liberty interest.

**D. The WCCS Form as a Moving Force Behind Plaintiff's Injuries**

198. Plaintiff's injuries are directly connected to Washington County's WCCS-71040-8 form. Until a hold form was signed on September 8, 2022, no peace officer hold existed for any of Plaintiff's children. As alleged in paragraph 93, the hospital recorded as late as 5:06 p.m. that day that hold paperwork had not been received, and the paperwork was faxed to the hospital only on September 9, 2022. The WCCS-71040-8 form was the paper by which Plaintiff's children were documented as held, and by which their custody continued, after it was signed at the hotel that afternoon.

199. That form cited a juvenile delinquency statute, Minn. Stat. § 260B.175, and not the child-protection statutes that govern emergency custody of a child who is not alleged to have committed an offense. The document on which Plaintiff's children were held therefore identified no ground for custody under Minn. Stat. §§ 260C.175 and 260C.176, and Plaintiff was not given the notice of the reasons for custody and placement that Minn. Stat. § 260C.176, subd. 3 requires.

200. The form listed 11:25 a.m. as the time the children were taken into custody, which was before Defendant Koethe arrived at Plaintiff's residence, and gave as its reasons only the handwritten phrases "drug use" and "current drug use," without any supporting fact, test result, or observation.

201. Plaintiff was never shown or served with the form. She first saw it in July 2026 (paragraph 125).

202. Upon information and belief, Washington County Community Services printed and distributed the form to law enforcement for use in child-protection holds, and kept it in use for more than thirteen years, so that the officer who signed it on September 8, 2022 worked from a County-issued template that cited the wrong statute. The County's printing, distribution, and

continued use of the form was a moving force behind the injuries described in this Part: the holding of Plaintiff's children on paper that stated no child-protection basis, the absence of notice of the grounds, and the distress that followed.

203. The municipal defendants acted with deliberate indifference, and their policies, customs, and training failures were the moving force behind the constitutional injuries suffered by Plaintiff.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brittani Larson respectfully requests that this Court enter judgment in her favor and against the Defendants, granting the following relief:

(A) Compensatory Damages against all Defendants as permitted by law, in an amount to be determined at trial, to compensate Plaintiff for emotional distress, mental anguish, family separation, loss of familial association, and the violation of her civil rights;

(B) Punitive Damages against the individual Defendants (Russell, Kekulah, Coffey, and Koethe) in their individual capacities, in an amount to be determined at trial, for conduct demonstrating reckless or callous indifference to Plaintiff's federally protected constitutional rights; provided that Defendant Galvin and the municipal Defendants shall not be liable for punitive damages;

(C) Taxable costs, filing fees, and other recoverable litigation expenses as permitted by law;

(D) Such other and further relief as this Court deems just and proper; and

(E) Plaintiff seeks solely retrospective monetary damages for independent constitutional torts and does not seek modification, reversal, or appellate review of any underlying state court family custody judgments.

**JURY DEMAND**

Plaintiff Brittani Larson hereby demands a trial by jury on all counts, claims, and issues so triable in this action.

Dated: October 30, 2026

Respectfully submitted,

/s/ Brittani Larson
Brittani Larson, Plaintiff Pro Se
4980 Hamlet Ave N. #213
Oakdale, MN 55128
651-323-1117
btclarson@gmail.com